# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MICHELE FISHER,            )
                                     )
           Plaintiff,         )
                                     )
           v.                   )        Case No. 18 C 4234
                                     )
BOARD OF EDUCATION OF THE     )        Judge Rebecca R. Pallmeyer
PRAIRIE-HILLS ELEMENTARY       )
SCHOOL DISTRICT 144, *et al.*,       )
                                     )
           Defendants.      )

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Michele Fisher is a Caucasian woman over the age of 50. She worked for more than fifteen years as a classroom teacher and, at times, a specialist in English language skills ("literacy coach") in Prairie-Hills Elementary School District 144. District 144 is a public school district located in South Suburban Cook County, Illinois. Defendants are the Board of Education of Prairie-Hills Elementary School District 144 (the "Board"), the members of the Board, and District 144's Superintendent, Dr. Kimako Patterson.[1] In April 2016, Fisher informed Dr. Patterson that there might be mold in her workplace (Chateaux Elementary School). Dr. Patterson arranged for mold testing, but the testing was not to Fisher's satisfaction. Dr. Patterson arranged to transfer Fisher to another school in the district (Markham Elementary School), but Fisher—who was suffering from chronic inflammatory response syndrome—requested a leave of absence under the Family and Medical Leave Act ("FMLA"). District 144 granted the request, effective in late August 2016. While Fisher was on leave, the District, expecting her to begin teaching at Markham, tested that school for mold and found none. Fisher asked District 144 to conduct a

---

[1] Fisher is suing Dr. Patterson and the members of the Board in their official capacities. (*See* Compl. [1-1], ¶ 4.) The members of the Board are: Barbara Nettles, Joyce Dickerson, Sharon Davis, Juanita Jordan, Elaine Walker, Kathy Taylor, and Natalie Myers. (*See* Defs.' L.R. 56.1 Stat. [63], ¶ 7.)

second test using a specific method that her doctor recommended, but the District refused. In February 2017, while Fisher still was on leave, District 144 determined that she could no longer work as a literacy coach after state auditors discovered that she lacked a necessary license. District 144 gave her the option of returning to work as a classroom teacher at Markham. Fisher never returned to work, however. In April 2018, after Fisher had been on continuous leave for more than eighteen months, the District terminated her employment.

In this lawsuit, Fisher alleges that Defendants revoked her literacy coach position because of her age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.[2] She also alleges that Defendants refused to conduct a second mold test at Markham, revoked her literacy coach position, and terminated her employment because she is Caucasian, in violation of 42 U.S.C. § 1981 and Title VII.[3] Defendants now move for summary judgment. For the following reasons, Defendants' motion is granted.

## BACKGROUND

[2]     Fisher has also asserted an age discrimination claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). (See Compl., Count I.) But Title VII does not apply to age discrimination claims. Rather, it prohibits employment discrimination based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Perhaps recognizing this distinction, Fisher has not briefed an age-based Title VII claim. (See Pl.'s Opp. to Defs.' Mot. for Summ. J. [89-5], 8-17.) The court concludes that she has abandoned it.

[3]     Initially, Fisher filed this lawsuit in the Circuit Court of Cook County, Illinois on May 14, 2018. (Defs.' L.R. 56.1 Stat. ¶ 17.) In addition to asserting age and race discrimination claims, which are set forth in Counts I and II, Fisher asserted claims for fraud, conspiracy to defraud, intentional infliction of emotional distress, negligence, gross negligence, recklessness, and wanton conduct, "ultrahazardous activity/strict liability," defamation, violation of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., and wrongful disclosure of personal health information. (See Compl., Counts III – XI.) Defendants removed the lawsuit to this court on June 18, 2018. (Defs.' L.R. 56.1 Stat. ¶ 17.) Then, they moved to dismiss Counts III through XI under Federal Rule of Civil Procedure 12(b)(6). (Id.) In a bench ruling on November 19, 2018, the court granted the motion to dismiss Fisher's state law claims (Counts III through IX and XI). (See Order [30], 1.) The court reasoned that the statute of limitations had run and the issuance of a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC") did not render the state-law claims timely. (Id.) The court also dismissed Fisher's CERCLA claim (Count X) because Fisher "ha[d] not responded to Defendants' arguments that they are not proper Defendants to such a claim," nor had she "alleged that she incurred response costs." (Id.) Fisher's only remaining claims are for alleged age discrimination (Count I) and race discrimination (Count II).

The court recounts the facts in the light most favorable to Fisher, to the extent that the record and Local Rule 56.1 permit.[4] District 144 is comprised of seven elementary schools, including Chateaux, Markham, and Mae Jemison. (*See* Defs.' L.R. 56.1 Stat. ¶¶ 1, 3, 30; Defs.' L.R. 56.1 Resp. [80] ¶ 3.) In 2016, 2,563 students were enrolled in the District. (Defs.' L.R. 56.1 Stat. ¶ 70.) Dr. Patterson, who is African-American, has been the Superintendent of District 144 since 2011. (*Id.* ¶ 8.)

## A. Revocation of Fisher's Literacy Coach Position

Fisher has a master's degree in elementary education. (Defs.' L.R. 56.1 Resp. ¶ 1.) District 144 hired her in September 2002 as a third-grade teacher at Mae Jemison. (*Id.* ¶ 3.) In 2004, she became a literacy coach, meaning a specialist in teaching "content and skills in the English language . . . using the course of study adopted by the [Illinois] Board of Education . . . ." (Classroom Literacy Coach Job Description, Ex. D to Defs.' L.R. 56.1 Stat. [63-2], 1; *see also* Defs.' L.R. 56.1 Stat. ¶ 3; Defs.' L.R. 56.1 Resp. ¶ 5.) Fisher worked as a literacy coach in District 114 for more than 10 years: first at Mae Jemison from 2004 to 2011 and then at Chateaux from

---

[4] Throughout this litigation, Fisher has repeatedly violated Local Rule 56.1 and has filed motions without properly noticing them. This has made the court's job unnecessarily difficult and time consuming. The court has done its best to sift through the record and extract the undisputed material facts. It relies in large part on Defendants' Local Rule 56.1 Statement of Material Facts because, despite having several opportunities to respond to it, Fisher failed to do so. *See, e.g.*, *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004) (stating that under Local Rule 56.1(b) "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party" (internal quotation marks omitted)). Fisher has also filed at least four versions of a Local Rule 56.1 Statement of Additional Material Facts [72, 81-3, 89-6, 98-1] and three versions of an opposition brief [72, 81-2, 89-5]. Although the court permitted Defendants to file a supplemental reply (*see* Order [88]), it appears that Defendants have replied only to Fisher's original opposition [72] and the first 40 paragraphs of Fisher's first Local Rule 56.1 Statement of Additional Material Facts [72]. The court has discussed other versions of Fisher's filings where appropriate. Its choice to extend this courtesy to Fisher did not prejudice Defendants. This ruling makes no mention of Fisher's affidavit [72-1, 85-2], the affidavit of Jan Barry [72-2], or the affidavit of Kelli Davis [72-3], because Fisher does not discuss those materials in her opposition to Defendants' motion for summary judgment.

2011 to 2016. (*See* Defs.' L.R. 56.1 Resp. ¶ 5, 7, 9.)[5]  In 2012, while Fisher was working at Chateaux, she became District 144's "lead district literacy coach." (*Id.* ¶ 10.)  According to Dr. Patterson, Fisher "has always been a good literacy coach." (Affidavit of Dr. Kimako Patterson ("Dr. Patterson Aff."), Ex. A to Defs.' L.R. 56.1 Stat. [63-1], ¶ 9; *see* Defs.' L.R. 56.1 Resp. ¶ 18; *see also* Fisher Deposition ("Fisher Dep."), Ex. C to Defs.' L.R. 56.1 Stat. [63-1], 112:20-22 (Fisher testifying that Dr. Patterson thought Fisher was "the best literacy coach").)

Defendants appear to contend that to become a literacy coach, a teacher has always been required to obtain a certification called a reading endorsement. (*See* Defs.' L.R. 56.1 Stat. ¶ 48.)[6] Fisher states that this requirement has been in place only since 2012. (*See* Pl.'s Opp. 15.) Regardless, the parties agree that Fisher lacked a reading endorsement when she became a literacy coach in 2004 and never obtained one. (Defs.' L.R. 56.1 Stat. ¶ 48; *see also* Defs.' L.R. 56.1 Resp. ¶¶ 12-13.)  The parties also agree that Defendants have always known this. (*See* Defs.' L.R. 56.1 Stat. ¶ 48; Defs.' L.R. 56.1 Resp. ¶ 13.)  And they agree that before the events giving rise to this lawsuit, District 144's Board "allowed Fisher to be grandfathered in" as a literacy coach even though she lacked the reading endorsement. (Dr. Patterson Aff. ¶ 37; Defs.' L.R. 56.1 Resp. ¶ 48 (citing same).)

According to Defendants, "[i]n January 2017," the "ISBE amended its state requirements and mandated that all literacy coaches hold the proper reading endorsement, or otherwise be returned to the classroom." (Defs.' L.R. 56.1 Stat. ¶ 48; Dr. Patterson Aff. ¶ 38.)  Given the

---

[5]     The court assumes that Fisher's literacy coach position was a full-time job that replaced classroom teaching.

[6]     The parties do not specify the law or entity that imposes this requirement, but the court assumes that it is the Illinois State Board of Education ("ISBE"). (*See, e.g.*, Defs.' L.R. 56.1 Stat. ¶ 49 (stating that the "ISBE amended its state requirements" for literacy coaches in January 2017); Ill. State Bd. of Educ., *Subsequent Teaching Endorsements (Reading Specialist)*, https://www.isbe.net/Pages/Subsequent-Teaching-Endorsements.aspx (last visited Mar. 16, 2020) (providing that reading specialists must, among other things, "[c]omplete a K-12 reading specialist preparation program from Illinois or out of state" and "[p]ass the Reading Specialist (176/221) content test").)

4

parties' agreement that literacy coaches have been required to hold reading endorsements since 2012 at the latest, the court assumes Defendants mean that a literacy coach must now hold an endorsement regardless of her past status.. Defendants have not provided a copy of or valid citation to the new law.[7] On February 1 and 2, 2017, the South Cook Intermediate Service Center ("SCISC") conducted an audit of District 144, including its "staff certification." (Defs.' L.R. 56.1 Stat. ¶ 49.)[8] The SCISC determined that Fisher lacked "the required credentials" for her "reported assignment" as a literacy coach. (*See* Feb. 7, 2017 SCISC Compliance Summary Report, Ex. GG to Defs.' L.R. 56.1 Stat. [63-2], 4; *see also id.* (stating that Fisher "[n]eeds a Reading Teacher or Reading Specialist endorsement").) The SCISC directed District 144 to "clarify" in writing within 30 days "how the staff certification issues/questions will be resolved." (*Id.* at 1.) As the court will discuss below, Fisher was on medical leave when the audit took place. (*See* Defs.' L.R. 56.1 Stat. ¶ 34.) On March 9, 2017, Fisher's union informed her that as a result of the audit, District 144 had "slated her to return to the classroom"—*i.e.*, to a classroom teacher role—the following year. (*Id.* ¶ 51.)

At all times relevant to this lawsuit, District 144 had seven literacy coaches in addition to Fisher: Leslie Roberts, Renee Merrick, Shena Watkins, Amy Hernandez, Nancy Kristin, Bridget Mitchell, and Bonnie Banka. (*Id.* ¶ 53.) Banka is, like Plaintiff, Caucasian and over the age of 50, and, as revealed in the SCISC audit, Banka also lacked a reading endorsement. (*See* Feb. 7, 2017 SCIC Compliance Summary Report 4; Defs.' L.R. 56.1 Stat. ¶¶ 53, 55.) District 144 therefore revoked Banka's literacy coach position and transferred her to a classroom teaching role. (Defs.' L.R. Stat. ¶¶ 53, 55; Dr. Patterson Aff. ¶ 46.) The other six literacy coaches—three of them African-American and three Caucasian—had reading endorsements and kept their

---

[7] Defendants cite the "Performance Evaluation Reform Act" and "Senate Bill 7." (Defs.' L.R. 56.1 Stat. ¶ 4.) But the court has not been able to locate either piece of legislation.

[8] The parties do not state whether the SCISC is a government entity.

positions. (*Id.* ¶¶ 52, 58.) The parties agree that one of those coaches (Merrick) is over the age of 50. (*See id.* ¶ 57.) According to Fisher, District 144 hired African-American literacy coaches to replace both Fisher and Banka; Fisher says these new hires were "younger," though she does not know their ages. (*See* Fisher Dep. 51:24-52:10.) Fisher evidently did not seek information about the ages of these replacement coaches in discovery, and admitted that the only basis for her belief that District 144 had hired younger, African-American literacy coaches was word-of-mouth from another teacher. (*See id.* at 52:11-21.) Finally, Fisher acknowledged that no one in District 144 "ever ma[d]e a comment to [her] about [her] age" or told her that she was "being removed as a literacy coach as a result of [her] age." (*Id.* at 61:4-10.)

**B.    Mold Testing and Fisher's Leave of Absence**

Fisher began a leave of absence under the FMLA in August 2016 because she was suffering from chronic inflammatory response syndrome. (*See, e.g.*, Defs.' L.R. 56.1 Stat. ¶¶ 26, 34.) Her doctor, Keith Berndtson, opined that she acquired the condition "by exposure to a water-damaged building." (July 20, 2016 FMLA Certification, Ex. N to Defs.' L.R. 56.1 Stat. [63-2], PH144.0027.) The court discusses these facts in more detail below.

In April 2016, while Fisher was working at Chateaux, she told Dr. Patterson that she thought there might be mold in the building. (Defs.' L.R. 56.1 Stat. ¶ 19.) District 144 hired a third party (Wight and Company) to investigate. (*Id.* ¶ 20.) Wight tested Chateaux for "airborne mold" on April 19, 2016. (*Id.*) The test "revealed no visible mold growth" but uncovered signs of "dust and plant mold." (*Id.* ¶¶ 20-21, 23.) On April 28, 2016, the day after Dr. Patterson received the test results, she sent an e-mail to Chateaux's staff stating that "there was no black mold in the building" but that there was "dust and plant mold." (*Id.* ¶¶ 20, 22-23.) Dr. Patterson instructed the staff to remove all live plants from classrooms and stated that the custodians would vacuum and dust more frequently. (*Id.* ¶ 23.) Fisher requested a copy of Wight's report but Dr. Patterson refused to give it to her. (*See* Defs.' L.R. 56.1 Resp. ¶¶ 27-28.) Dr. Patterson did, however, ask Wight to conduct a follow-up mold test. (Defs.' L.R. 56.1 Stat. ¶ 25.) Wight tested the building

again in May 2016 and found "no visible mold growth." (*Id.*)  In July 2016, Fisher told Dr. Patterson that she was suffering from chronic inflammatory response syndrome.  (*Id.* ¶ 26.)  Dr. Patterson "offered to transfer [her] to another school to accommodate her medical condition," and Fisher stated that she would like to be transferred.  (*Id.*)  On August 10, 2016, Dr. Patterson determined that Fisher would "be transferred to Markham . . . as a Literacy Coach."  (*Id.* ¶ 30.)

On July 20, 2016—several weeks before Dr. Patterson approved Fisher's transfer to Markham—Fisher submitted a request for FMLA leave.  (*Id.* ¶ 28.)  She provided supporting documentation from her physician, Dr. Berndtson.  (*Id.*)  According to Fisher, Dr. Berndtson "refused to fill out dates for her leave until the District made accommodations for a clean environment."  (Defs.' L.R. 56.1 Stat. ¶ 29.)  At District 144's request, Dr. Berndston provided supplemental information.  (*Id.* ¶¶ 32-33.)  He stated that Fisher's "condition will last indefinitely if recurrently exposed to airborne inflammation triggers," but estimated that she would need to be on leave from August 23, 2016 to November 15, 2016.  (August 31, 2016 Supp. FMLA Certification, Ex. S to Defs.' L.R. 56.1 Stat. [63-2], PH144.0036-27.)  District 144 approved Fisher's FMLA request for that timeframe.  (*See* Defs.' L.R. 56.1 Stat. ¶ 34.)

On November 11, 2016—four days before Fisher was scheduled to begin working at Markham—Dr. Berndston asked District 144 to test Markham for mold before Fisher returned.  (*See id.* ¶ 35.)  Specifically, he stated that "absent results of a dust sampling for the presence of mold DNA at Fisher's work location," he could not "determine her chances of recovering from her inflammatory condition."  (*Id.*)  Around the same time, Fisher "acknowledged that her FMLA leave expired on November 15, 2016" and asked District 144 for "a medical leave for the remainder of the 2016-2017 school year."  (*Id.* ¶ 36.)  The District permitted her to begin an unpaid leave of absence starting December 1, 2016.  (*Id.*)[9]

---

[9]        The court assumes this was a form of leave permitted under the Collective Bargaining Agreement between the Board and the "District 144 Education Association," Fisher's union.  (*Id.* ¶ 12; *see id.* ¶ 13 ("Pursuant to the CBA, the Board may grant a Certified Staff member a leave of absence without pay.").)

On December 19, 2016, "at Dr. Patterson's request," District 144's maintenance crew "conducted a walk-through of Markham in an attempt to identify water staining, leaks, or any evidence of mold." (*Id.* ¶ 37.) In a written report, the maintenance crew stated that it "inspected . . . the entire complex" and found "[n]o traces of water staining, leaks or mold." (Memo., Ex. X to Defs.' L.R. 56.1 Stat. [63-2], PH144.0742; *see* Defs.' L.R. 56.1 Stat. ¶ 37.) On March 8, 2017, Dr. Patterson "advised Fisher that she was denying her November 11, 2016 request for [additional] mold testing at Markham . . . and for continued leave through the end of the school year." (Defs.' L.R. 56.1 Stat. ¶ 38.) Dr. Patterson noted that the maintenance crew had not found mold at Markham; Fisher "had not worked a single day" there; and no one had complained of mold at the school. (*Id.*) Dr. Patterson "directed Fisher to return to her position at Markham . . . on March 20, 2017." (*Id.* ¶ 39.)

On March 14, 2017, Fisher informed Dr. Patterson that she was not well enough to return. (*Id.* ¶ 40.) Dr. Patterson requested more information. (*Id.* ¶ 41.) In April and July of 2017, Dr. Berndston reiterated his request for additional mold testing. (*See id.* ¶¶ 42-43.) For example, his April 2017 letter stated that once Fisher had recovered sufficiently, he would "require dust samples" from Markham "so they can be subject to analysis for mold DNA." (*Id.* ¶ 42.) By February 2018, Dr. Patterson had not heard anything else from Fisher or her doctor. (*See id.* ¶ 44.) Accordingly, Dr. Patterson sent Fisher a letter "seeking an update on her return to work status . . . ." (*Id.*) Fisher did not respond. (*Id.* ¶ 45.) Dr. Patterson followed up in March 2018. (*Id.*) She wrote that "Fisher had been on continuous medical leave for approximately eighteen (18) months," and that "due to [Fisher's] failure to provide the District with updates regarding her medical history, [her] indefinite ability to return to work, her inability to perform the essential duties of her position, and the District's need to staff her position for the 2018-2019 school year, she would be recommended for termination." (*Id.* ¶¶ 45-46.) Fisher did not respond. (*See id.* ¶ 46.) District 144 terminated Fisher's employment in April 2018 after Dr. Patterson sent her yet another letter and offered to meet with her. (*Id.* ¶ 47; *see* Compl. ¶ 3.)

According to Fisher, Defendants refused her request to conduct an additional mold test at Markham yet provided medical accommodations to three other employees: Leona Galloway and Nakia Matthews, who are African-American, and Jenny Hung, who is Asian-American. (Defs.' L.R. 56.2 Stat. ¶ 62; *see also* Fisher Dep. 67:12-17 (testifying that Hung "has accommodations and can have oxygen," Galloway "can have oxygen," and Matthews "has an issue and is allowed to come to school late and have excessive absences").) But Fisher has not disputed the following facts: Galloway used an oxygen tank while working at Chateaux, but she never made an FMLA request to do so and "was able to otherwise perform the essential functions of her job" while using the oxygen tank. (Defs.' L.R. 56.1 Stat. ¶ 63.) Hung's circumstances were identical to Galloway's. (*See id.* ¶ 64.) Matthews worked at Mae Jemison from 2005 to 2007, before Dr. Patterson became District 144's Superintendent. (*Id.* ¶ 65.) She never made an FLMA request or "sought a late start accommodation" for a medical condition. (*Id.*)

## C. Allegations Concerning Race Discrimination

Fisher contends that there is "an underlying tone of 'black pride' throughout" District 144. (*Id.* ¶ 66.) At her deposition, she testified that this "tone" was "provided" by a poem that "the superintendent of curriculum and instruction" e-mailed "to the entire district" on March 22, 2017. (Fisher Dep. 87:4-14; *see* Defs.' L.R. 56.1 Stat. ¶ 67.) The purpose of the poem was to congratulate Dr. Patterson "on an award that she won." (Fisher Dep. 87:14-88:13; *see* Defs.' L.R. 56.1 Stat. ¶ 67.) It stated, "Congratulations phenomenal woman! Phenomenally black, beautiful and the best at what you do! Phenomenal black woman, that's you!" (Defs.' L.R. 56.1 Stat. ¶ 67.) Fisher was on leave when the poem appeared in her e-mail. (*See, e.g.*, *id.* ¶ 45.)

"Each school year, Dr. Patterson assigns a book" for the staff to read and discuss in order to "enhance diversity, cultural sensitivity and leadership." (*Id.* ¶ 69.) During the 2012-2013 and 2013-2014 school years, Dr. Patterson assigned a book called "We Can't Teach What You Don't Know: White Teachers Multiracial Schools." (*Id.* ¶ 71.) Staff members were required to attend weekly book discussions after school. (*See id.* ¶ 73; Fisher Dep. 77:19-78:8.) Dr. Patterson

extended the book assignment into the 2014-2015 school year after teachers gave her positive feedback and told her that they "wanted to take their time with the material." (Defs.' L.R. 56.1 Stat. ¶ 71.) Fisher testified that "the book itself" is "wonderful" and "is not race discrimination." (Fisher Dep. 72:21-22.) She claims, however, that she experienced race discrimination during one book discussion in the 2012-2013 school year. (*See id.* at 72:12-77:18; Pl.'s Opp. 21.) Specifically, Fisher testified that the Principal of Chateaux (Glenn Greene) gave the staff "a copy of the Jim Crow laws"; told them "that racism exists in the United States today" and that "segregation continues"; and stated that history is being "taught incorrectly" because it is being "told from the white man's perspective." (Fisher Dep. 72:22-73:3, 75:16-76:4; *see* Defs.' L.R. 56.1 Stat. ¶ 72.) According to Fisher's deposition testimony, she told Greene that the discussion made her "very uncomfortable," and he responded, "[T]here are racist teachers here. You're not one of them, Fisher, so don't worry about it." (Fisher Dep. 76:13-19.) Fisher testified that she did not report Greene's statements to Dr. Patterson "because [she] liked" him. (*Id.* 104:4-8.)

Fisher filed a charge of discrimination with the EEOC on May 18, 2017. (Defs.' L.R. 56.1 Stat. ¶ 16.) She alleged, among other things, that Defendants had discriminated against her because of her age and her race. (*See id.*) The EEOC issued a right-to-sue letter on February 13, 2018. (Compl. ¶ 1.) Fisher then filed this lawsuit.

## DISCUSSION

To prevail on a motion for summary judgment, the moving party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party "bears the burden of demonstrating the absence of genuine issues of material fact." *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019). "If that occurs, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted). When ruling on a

motion for summary judgment, the court will view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255; *see also, e.g.*, *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367 (7th Cir. 2019).

## A. Age Discrimination

Fisher alleges that Defendants revoked her literacy coach position because of her age, in violation of the ADEA. "The ADEA protects workers 40 years of age and older from age-based employment discrimination." *McDaniel*, 940 F.3d at 367 (internal quotation marks omitted); *see* 29 U.S.C. § 631(a). The statute makes it unlawful for an employer, among other things, "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "To recover under a theory of disparate treatment in the ADEA context, it's not enough to show that age was *a* motivating factor. The plaintiff must prove that, but for his age, the adverse action would not have occurred." *McDaniel*, 940 F.3d at 367 (internal quotation marks omitted). "[T]he singular question that matters in a discrimination case is: '[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor"—here, age—"caused the discharge or other adverse employment action.'" *Id.* (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018)); *see Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

An ADEA plaintiff "may proceed by introducing direct or circumstantial evidence that her employer took an adverse action against her because of her age." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018). She may also employ the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *McDaniel*, 940 F.3d at 367-68; *Skiba*, 884 F.3d at 719; *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *Ortiz*, 834 F.3d at 766. Under the *McDonnell Douglas* approach, "the plaintiff must show evidence that (1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4)

similarly situated employees who were not members of her protected class were treated more favorably." *McDaniel*, 940 F.3d at 368 (internal quotation marks omitted). Where plaintiff makes such a showing, the defendant may articulate a "legitimate, nondiscriminatory reason for the adverse employment action," and plaintiff then has the burden of showing that the employer's explanation is pretextual. *Id.* "However the plaintiff chooses to proceed, at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action *because of* her age." *Skiba*, 884 F.3d at 720 (internal quotation marks omitted); *see also McDaniel*, 940 F.3d at 368.

The parties discuss Fisher's ADEA claim in terms of "direct . . . or circumstantial evidence," on the one hand, and the *McDonnell Douglas* framework, on the other. (*See* Defs.' Mot. 2-9; Pl.'s Opp. 8-17.) The court declines to address these methods of proof independently, not only because the Seventh Circuit has instructed district courts to "stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards," *Ortiz*, 834 F.3d at 765, but also because the parties' arguments concerning "direct" and "indirect" evidence are largely repetitive. The court begins its assessment of the evidence by applying the *McDonnell Douglas* framework, and then considers the evidence cumulatively to determine whether it would permit a reasonable jury to conclude that Defendants revoked Fisher's literacy coach position because of her age. *See, e.g.*, *McDaniel*, 940 F.3d at 368.

Defendants maintain that Fisher cannot establish a prima facie case of age discrimination under the *McDonnell Douglas* framework because she cannot show that she was meeting Defendants' legitimate expectations or that similarly situated employees under the age of 40 were treated more favorably. First, according to Defendants, no jury reasonably could conclude that Fisher was meeting Defendants' legitimate expectations for a literacy coach because she lacked the required reading endorsement. (*See* Defs.' Mot. 5-7.) Defendants acknowledge that "in the past," Dr. Patterson "was able to receive approval by the Board to grandfather" Fisher in as a literacy coach even though she was not properly licensed. (*Id.* at 6 (internal quotation marks

omitted).)  But Defendants urge that the January 2017 change in law stripped the Board of discretion to retain unlicensed literacy coaches, and that the February 2017 audit confirms this. (*See id.* at 6-7.)  Thus, Defendants argue, at the time they revoked Fisher's literacy coach position, she was not meeting their legitimate expectations for a literacy coach.  (*See id.* (citing *Brummett v. Lee Enters., Inc.*, 284 F.3d 742, 745 (7th Cir. 2002) (where an employer required "a valid driver's license and a good driving record" for business reasons, and the plaintiff's driver's license had been suspended for bad driving, the plaintiff could not show that he was meeting his employer's legitimate expectations)).)

Fisher responds that she was a great literacy coach and therefore "met the District's legitimate expectations" even though she lacked a reading endorsement.  (Pl.'s Opp. 12.)  She notes, for example, that Dr. Patterson deemed her "the best" literacy coach; Defendants grandfathered her into the role even though she did not hold a reading endorsement; and Defendants promoted her to lead district literacy coach in 2012.  (*Id.*)[10]  This argument falls short; Fisher's abilities notwithstanding, if the law changed in 2017 such that the ISBE required reading endorsements for literacy coaches without exception, she was not qualified.  As in *Brummett*, what matters is whether Fisher held a specific credential that was essential to her job duties.  *See Brummet*, 284 F.3d at 745.  Fisher concedes that she did not.

Fisher's next argument has a bit more traction.  She contends that she "was properly grandfathered in" to her position and that Defendants have not offered proof of the alleged change in law.  (Pl.'s Opp. 10, 13-14; *see also* at 14 (arguing that Defendants "have not once shown company policy requiring Literacy Coaches to seek a reading specialist endorsement" without exception, and noting that in *Brummett*, 284 F.3d at 745, the parameters of the company policy were clear).)  Defendants' inability to produce or cite the alleged change in law is puzzling, as is

---

[10]    Fisher makes other related assertions—such as that her master's degree "put her above her colleagues" (*see id.*)—but the court disregards them because they are not supported with record cites.

the fact that the court has been unable to find it. (*See, e.g.*, Defs.' Reply in Supp. or Mot. for Summ. J. ("Defs.' Reply") [79], 12 (acknowledging that they have not cited the law without explaining why).) It is undisputed that in the February 2017 audit, the SCISC determined that Fisher and Banka "need[ed]" reading endorsements. (Feb. 7, 2017 SCISC Compliance Summary Report 4; *see* Defs.' Reply 12.) But it is also undisputed that reading endorsements have been required for literacy coaches since at least 2012; that District 144 exempted Fisher from that requirement after 2012; and that the SCISC's audit results say nothing about a change in District 144's discretion to "grandfather in" veteran literacy coaches. Accordingly, the court concludes for purposes of this ruling that Fisher has shown that she was able to meet District 144's legitimate expectations at the time she was removed from the position as literacy coach.[11]

This conclusion does not assist Fisher, however, because she has not shown that similarly situated employees under the age of 40 were treated more favorably. Similarly situated employees "need not be identical in every conceivable way," but they "must be directly comparable to the plaintiff in all material respects." *McDaniel*, 940 F.3d at 368 (internal quotation marks omitted). In general, a plaintiff "must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 369 (internal quotation marks omitted). "Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue." *Id.* (internal quotation marks omitted).

---

[11]     Given this conclusion, the court does not address Fisher's case law concerning the general purposes of grandfather clauses (*see* Pl.'s Opp. 14 (citing cases)), nor her contention—based on a non-binding case issued more than 40 years ago—that once an employee is grandfathered into a position, "any subsequent legislation affecting his profession must be reasonable as it affects his special situation." (*Id.* (quoting *Berger v. Bd. of Psychologist Examiners*, 521 F.2d 1056, 1063 (D.C. Cir. 1975) (internal quotation marks omitted).)

As Defendants observe, Fisher offers no evidence that any literacy coach under the age of 40 retained her position even though she lacked a reading endorsement. (*See* Defs.' Mot. 7-8; Defs.' Mot. 14-15.) Indeed, Fisher has not identified any literacy coaches in District 144 who are younger than 40 at all; she contends that five other literacy coaches in District 144 are "younger" than she is, but she offers no evidence of their ages. (Pl.'s Opp. 15.)[12] Fisher's deposition testimony about the age of her replacement (and Banka's replacement) is based on hearsay and is conjectural. (*See* Fisher Dep. 51:24-52:21 (testifying that according to another teacher, "younger" literacy coaches replaced Fisher and Banka).) Speculating that alleged comparators "were younger," without "suppl[ying] . . . information for the court to verify [the plaintiff's age] relative to" the age of her comparators is insufficient to create a factual dispute. *McDaniel*, 940 F.3d at 369. Separately, Fisher concedes that every literacy coach who remained after the February 2017 audit had a reading endorsement. (*See* Defs.' L.R. 56.1 Stat. ¶¶ 52, 58.) Fisher, therefore, has not "point[ed] to any other literacy coach under 40 years old who lacked the requisite reading endorsement but kept her position." (Defs.' Reply 14.) Fisher responds to this deficit in her case by contending that Dr. Patterson gave "younger" literacy coaches "the opportunity to get a reading endorsement" but did not do the same for her. (Pl.'s Opp. 15.) She provides no record cite for this contention, however, so the court disregards it. (*See id.*)

Because Fisher "has not identified any similarly situated employees to allow a factfinder to conduct a 'meaningful comparison,' [her] prima facie case for [age] discrimination fails." *McDaniel*, 940 F.3d at 369 (quoting *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007)). Fisher's ADEA claim fares no better when the court considers the evidence cumulatively. Although Fisher was a proficient literacy coach and Defendants exempted her from the reading

---

[12] Fisher cites her October 14, 2019 Amended Local Rule 56.1 Statement of Additional Facts ("Pl.'s Oct. 2019 Am. L.R. 56.1 Stat.") [89-6], ¶ 15, which itself cites pages 110 and 111 of Fisher's Deposition. (*See* Pl.'s Opp. 15.) The testimony on those pages says nothing about literacy coaches' age. (*See* Fisher Dep. 110-111.)

endorsement requirement for many years, the record shows that Defendants changed their approach in response to a specific event that had nothing to do with Fisher's age:  the SCISC's February 2017 audit of District 144.   Fisher contends that Defendants had allowed her to keep working as a literacy coach after similar audits in previous years (*see, e.g.*, Pl.'s Opp. 17), but she has offered no evidence to support that argument—or even to support the proposition that the SCISC audited District 144 at any other time while she was a literacy coach.   Further, although Defendants revoked literacy coach positions only from employees over the age of 50 (Fisher and Banka), Fisher admits that every other literacy coach in District 144 had a reading endorsement. She has also failed to adduce evidence that any of the literacy coaches that kept their jobs were under the age of 40.  In fact, Fisher concedes that one (Merrick) was older than 50.  No reasonable jury considering this evidence could conclude that Defendants wanted to get rid of older literacy coaches or "systemic[ally]" discriminated against them.  (Pl.'s Opp. 9.)  Similarly, despite arguing that numerous literacy coaches over the age of 40 were "demoted," "forced into retirement," or "terminated" (*id.* at 9-10), Fisher provides record evidence only that she and Banka were removed from their positions.

Fisher does argue in her opposition brief that she "was repeatedly asked if she was going to retire because she was over 50 and had worked for over 27 years."  (*Id.* at 9 (citing Pl.'s Oct. 2019 Am. L.R. 56.1 Stat. ¶¶ 35, 37 (citing Fisher Dep. 70:8-11, 71:15-19)).)  But this argument misrepresents the record.  According to Fisher's deposition testimony, Dr. Patterson asked her if she "planned to resign" while the two were discussing Fisher's request for additional mold testing. (Fisher Dep. 70:8-11, 71:9-10.)  Dr. Patterson did not mention age or retirement.  (*See id.*) Instead, it was Fisher who did so.  (*Id.* at 70:10-11 ("My response was no, I don't plan to resign. I'm old.  I'm close to retirement.").)  And in her deposition testimony, Fisher did not characterize this discussion as age-related; she testified that no one at District 144 "ever ma[d]e a comment to [her] about [her] age" or told her that she was "being removed as a literacy coach as a result of [her] age."  (*Id.* at 61:4-10.)

Finally, Fisher contends that she "meets all the requirements to attain the necessary [reading] endorsement by just taking the appropriate test and would have attained the endorsement well before the September 1, 2019 deadline if required by the District." (Pl.'s Opp. 15; *see also id.* at 17 (stating that "Defendants rushed to strip her Literacy Coach position away without first asking her if she was willing to take the test and receive the endorsement by September 1, 2019").) In support of this argument, Fisher cites 23 Illinois Administrative Code Section 20.10, which provides that "candidates for an endorsement in elementary education" who are "enrolled in an elementary program not approved under this Part shall complete the program on or before September 1, 2018" and shall verify receipt of the endorsement "by September 1, 2019." 23 ILL. ADMIN CODE 20.10(a), (c). She also cites 105 ILCS 5/21B-25(2)(E), which provides that "[t]eacher leader endorsement[s]" "shall be available" to teachers who, among other things, have a master's degree and "have completed a program of study that has been approved by the State Board of Education . . . ." Assuming these laws govern literacy coaches (neither side has explained this), Fisher has adduced no evidence that she asked Defendants for permission to obtain a reading endorsement so that she could keep her position, or that Defendants denied her that opportunity. At best, Fisher argues that at some point before her leave of absence, Dr. Patterson "dissuaded" her from obtaining a reading endorsement because it would not increase her pay. (*Id.* at 10; *see* Fisher Dep. 116:14-19 (testifying that Fisher and Dr. Patterson "had discussion over the fact that if I were to go get that, that it would not result in any pay increase. It was agreed upon that I would remain in that position").) A pay-related discussion while Defendants were still "grandfathering" Fisher into her position does not permit an inference that Defendants discouraged or prevented her from becoming licensed after the February 2017 audit—let alone that they did so because of her age.

No reasonable jury considering this record could find that Defendants revoked Fisher's literacy coach position because of her age. Accordingly, the court grants Defendants' motion for summary judgment on Fisher's ADEA claim.

## B.     Race Discrimination

Fisher's remaining claim is that Defendants discriminated against her because she is Caucasian by denying her request for a medical accommodation (conducting an additional mold test at Markham), revoking her literacy coach position, and terminating her employment.  (*See* Pl.'s Opp. 17, 25.)  Title VII makes it unlawful for an employer, among other things, "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1).   Section 1981 provides that "[a]ll persons within the jurisdiction of the United States" shall have the same right "to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981.  "The legal analysis for discrimination claims under Title VII and § 1981 is identical," so the court "merge[s] [its] discussion of" Fisher's claims under those statutes.  *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 788 (7th Cir. 2019).  Like an ADEA claim, a Title VII claim survives summary judgment if the plaintiff adduces evidence that, "considered as a whole," would permit a reasonable jury to conclude that she was subjected to an adverse employment action because of her race.  *Ortiz*, 834 F.3d at 765; *see also, e.g.*, *McCurry*, 942 F.3d at 788.  Because Fisher relies on the *McDonnell Douglas* burden-shifting framework to carry this burden (*see* Pl.'s Opp. 17-27), the court, as before, uses that framework as a starting point and then considers the evidence cumulatively to determine whether a jury reasonably could find in Fisher's favor.  *See, e.g.*, *David*, 846 F.3d at 224.

Fisher is asserting a "reverse discrimination" claim; she alleges that Defendants discriminated against her because she is a member of a "majority group[]" (Caucasians).  *Phelan v. City of Chi.*, 347 F.3d 679, 684 (7th Cir. 2003).  To establish such a claim, Fisher must "show 'background circumstances' that demonstrate that [Defendants] ha[ve] 'reason or inclination to discriminate invidiously against whites' or evidence that 'there is something 'fishy' about the facts at hand.'"  *Id.* (quoting *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 455 (7th Cir. 1999)).  Fisher must also demonstrate that she (1) was meeting Defendants' legitimate employment

expectations; (2) suffered an adverse employment action; and (3) was treated less favorably than similarly situated, non-Caucasian individuals.  *See, e.g.*, *David*, 846 F.3d at 225; *cf. Phelan*, 347 F.3d at 684.  Defendants argue that Fisher cannot make out a prima facie case of race discrimination because she cannot show that Defendants "had a reason or inclination to discriminate against Caucasians" or treated similarly situated, non-Caucasian employees more favorably.  (Defs.' Mot. 14.)

Turning first to "background circumstances," Fisher argues that District 144 fostered a "systemic culture of racism" against Caucasians by (1) favoring African-Americans in its hiring practices; (2) assigning the book, "We Can't Teach What You Don't Know:  White Teachers Multiracial Schools," to the staff; (3) allowing Chateaux's Principal, Greene, to "target[] . . . white teachers as being racist"; and (4) "recogni[zing] . . . skin color as an attribute of greatness" in Dr. Patterson through the "Phenomenal Woman" poem.  (Pl.'s Opp. 18-19.)  As discussed below, the court is not of the view that these "background circumstances" suggest that Defendants were inclined to discriminate against Caucasians.  *Phelan*, 347 F.3d at 684 (quoting *Mills*, 171 F.3d at 455).

According to Fisher, "Defendants' hiring practices have changed the leadership at the District from one of [d]iversity to one that is almost exclusively African-American."  (Pl.'s Opp. 18; *see also id.* at 22-23.)  In support, she contends that the principals of all seven schools in District 144 are African-American and that only one of "about eight" administrators is Caucasian.  (*Id.* at 18.)  Even if these statistics are accurate, the racial composition of District 144's principals and administrators is not itself suspicious.  *See, e.g.*, *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 829 (7th Cir. 2006) (stating that "to create an inference of discrimination," plaintiffs "must do more than merely point to race and proclaim:  'Aha!  Discrimination.'").  Where plaintiffs "rely on the racial composition of a workforce as evidence of discrimination," the evidence is "next to worthless" if the plaintiffs cannot show "how many positions became available during the relevant time frame, the number and race of the candidates applying for those positions, and the

candidates' relative qualifications." *Id.* (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1177 (7th Cir. 2002)). Fisher (who has not suggested she herself was a candidate for the position as principal) presents no evidence about the number of such positions that were available and when, who applied for them, or the applicants' qualifications. Accordingly, the racial composition of District 144's leaders does not provide a basis for a reasonable conclusion that Defendants tended to discriminate against Caucasians.

In a similar vein, Fisher contends that five literacy coaches were Caucasian between 2012 and 2016, whereas today, "only two" are Caucasian. (Pl.'s Opp. 18.) She also maintains, relying only on hearsay, that District 144 replaced her (as well as Banka) with African-American literacy coaches. (*See id.* (citing Pl.'s Oct. 2019 Am. L.R. 56.1 Stat. ¶¶ 15, 36 (citing Fisher Dep. 52, 110-111)).) Even taking Fisher at her word, she has not provided any context for Defendants' hiring decisions. *See Hague*, 436 F.3d at 829. No jury reasonably could conclude that Defendants' decision to hire African-American literacy coaches in place of Fisher and Banka is a background circumstance that reflects animus toward Caucasians.

No reasonable jury could reach that conclusion concerning the staff book assignment, either. Fisher's own testimony that the book was "wonderful" and did not itself constitute race discrimination (Fisher Dep. 72:21-22) undermines her argument that the book selection implied "that white teachers were racist" and "created animus against white teachers." (Pl.'s Opp. 19.) Principal Greene's comments about racism at the book discussion in 2012 or 2013—and his choice to distribute the Jim Crow laws at the discussion—may well have offended Fisher. But that episode occurred years before Defendants took adverse employment actions against Fisher. *Cf. Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 964 (7th Cir. 2006) ("[S]tray remarks in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus," although this "rule may give way" when the "remarks are made by the decision-maker" and "around the time of, and . . . in reference to, the adverse employment action complained of." (internal quotation marks omitted)). Fisher insists that Principal Greene's offensive conduct was

pervasive because the staff met once a week for book discussions over several school years. (*See* Pl.'s Opp. 20.) The frequency of meetings is irrelevant, however, because Fisher has offered no evidence that similar incidents occurred at other meetings. Fisher also concedes that Principal Greene played no role in the adverse employment actions against her, and the record lacks evidence that he had any control or influence over District 144's hiring decisions. No reasonable jury could credit Fisher's argument that Principle Greene's actions reflect a tendency by Defendants to discriminate against Caucasians.[13]

The same reasoning applies to the "Phenomenal Black Woman" poem. Fisher admits that an administrator e-mailed the poem to District 144's staff in order to congratulate Dr. Patterson, who is African-American, on her accomplishments. (*See* Defs.' L.R. 56.1 Stat. ¶ 67; Fisher Dep. 87:14-88:13.) The poem says nothing about Caucasian employees (*see* Defs.' L.R. 56.1 Stat. ¶ 67), and the record contains no evidence that the administrator who e-mailed it was a decision-maker in the adverse employment actions at issue. In fact, the administrator sent the e-mail on March 22, 2017—which was after District 144 revoked Fisher's literacy coach position and after Dr. Patterson denied her request for additional mold testing at Markham. (*See* Defs.' L.R. 56.1 Stat. ¶¶ 38, 51, 67.) It is simply unreasonable to infer that the "Phenomenal Black Woman" poem reflects anti-Caucasian bias in District 144. Fisher has identified no basis for suspicion that Defendants have a "reason or inclination" to discriminate against Caucasian employees. *See Phelan*, 347 F.3d at 684 (quoting *Mills*, 171 F.3d at 455).

Even if additional "background circumstances" are not considered, Fisher's race discrimination claim fails for the straightforward reason that she has offered no evidence that Defendants treated non-Caucasian employees more favorably. As discussed earlier, Fisher contends that Defendants engaged in race-based discrimination by revoking her literacy coach

---

[13]     Because Fisher's allegations concerning the book choice and Greene's actions do not assist her, the court need not reach Defendants' argument that they are time-barred.

position, refusing her request for a medical accommodation (an additional mold test at Markham), and terminating her employment. (*See* Pl.'s Opp. 17, 25.) But the only evidence concerning any purportedly similarly-situated employees that she has offered involves employees who she believes were granted medical accommodations. (*see id.* at 23-25: Galloway and Matthews, who are African-American, and Hung, who is Asian-American. Fisher concedes that Galloway, Matthews, and Hung never requested medical accommodations from District 144. She argues that their situations nevertheless reflected favorable treatment as compared to her, because they engaged in self-help and the District "tolera[ted]" it. (Pl.'s Opp. 23-24; *see also id.* at 24 (emphasizing that when Fisher sought "permission" for a medical accommodation, Dr. Patterson accused her of "holding the District hostage").) The court disagrees. Fisher asked Defendants to engage in affirmative conduct (mold testing) and to permit her to remain on leave from work until they did so. Galloway and Hung, on the other hand, simply brought medical equipment to work and went about their duties. And even if Matthews arrived at work late or was sometimes absent, the record contains no evidence that those issues interfered with her job performance. As with her ADEA claim, Fisher "has not identified any similarly situated employees to allow a factfinder to conduct a 'meaningful comparison.'" *McDaniel*, 940 F.3d at 369 (quoting *Barricks*, 481 F.3d at 560). That precludes her from establishing a prima facie case of race discrimination. *See id.*[14]

Considering the record as a whole does not salvage Fisher's claim. For example, setting aside Principal Greene's actions at one book discussion in 2012 or 2013, Fisher has not adduced evidence that Defendants ever commented on her race in a negative way. Principal Greene reportedly assured Fisher that she was "not one of" the racist teachers, so she did not need to

---

[14]     Fisher also appears to argue that Defendants' favorable treatment of Galloway, Hung, and Matthews is a "background circumstance" reflecting their anti-Caucasian bias. (*See* Pl.'s Opp. 19.) Because the evidence does not permit a conclusion those employees are similarly situated to Fisher, this argument lacks merit.

"worry." (Fisher Dep. 76:13-19.) And the book discussion that offended Fisher occurred several years before the adverse employment actions at issue in this lawsuit. The record also shows that Defendants tried to accommodate Fisher several times before they took adverse employment actions against her. After Fisher reported possible mold at Chateaux, Dr. Patterson hired Wight to test the building. (Defs.' L.R. 56.1 Stat. ¶¶ 19-20.) When Fisher was unsatisfied with the results, Dr. Patterson had Wight conduct another test. (*Id.* ¶ 25.) Dr. Patterson later offered to transfer Fisher to another school and asked District 144's maintenance crew to test that school for mold, as well. (*Id.* ¶¶ 26, 37.) And although Defendants denied Fisher's request for additional mold testing at Markham, they provided several reasons for that decision: the maintenance crew had already inspected Markham and had found no traces of mold; District 144 had never received complaints about mold at Markham; and Fisher had not worked a single day at the school. (Defs.' Mot. 18 (citing Defs.' L.R. 56.1 ¶ Stat. 38).) Ultimately, Defendants allowed Fisher to remain on leave for more than eighteen months. (*See* Defs.' L.R. 56.1 Stat. ¶¶ 45, 47.) They revoked her literacy coach license during that time, but the record lacks evidence that Fisher asked for permission to obtain a reading endorsement so that she could keep her position, that she made any effort to acquire the endorsement on her own, or that Defendants prevented her from doing so. Defendants, moreover, tried to communicate with Fisher about her plans to return to classroom teaching before they terminated her employment. (*See id.* ¶¶ 44-47.) And Fisher has offered no evidence that would permit a reasonable jury to conclude that Defendants treated non-Caucasian employees more favorably than Fisher.

Fisher's remaining arguments in support of her race discrimination claim are unavailing.[15] First, she complains that Dr. Patterson informed staff members via e-mail that there was "no mold" at Chateaux despite that tests revealed plant and dust mold. (Pl.'s Opp. 25.) No reasonable jury

---

[15]     The court does not address arguments that Fisher fails to support with record cites. (*See generally* Pl.'s Opp. 25-27.)

could conclude that this characterization of the test results in Dr. Patterson's all-staff e-mail reflects anti-Caucasian bias. Next, Fisher notes that after Dr. Patterson sent the all-staff e-mail, she found mold in at least two classrooms at Chateaux: Fisher's and that of an African-American teacher. (*See id.* at 25-26.) According to Fisher, Dr. Patterson told the African-American teacher to go home because her room was unsafe, yet "told Fisher to stay." (*Id.* at 26.) As the court understands this argument, Fisher contends that Dr. Patterson showed more concern for the African-American teacher's health than for hers. But the evidence does not support this. Fisher's deposition testimony, which is the only source she cites, does not state that Dr. Patterson told her to stay in a dangerous space. (*See id.* at 25 (citing Pl.'s Oct. 2019 Am. L.R. 56.1 Stat. ¶ 20 (citing Fisher Dep. 66:14-20)); *see also* Fisher Dep. 62:20-63:22.) Fisher also maintains that Defendants removed mold from her classroom at Chateaux in an unsafe manner. (Pl.'s Opp. 26.) But even if that is true, the record does not show that Defendants used safer measures to remove mold from the African-American teacher's classroom. (*See id.*; Fisher Dep. 62:20-63:22.) Fisher's argument that Dr. Patterson was "not willing to share" reports summarizing mold test results suffers from a similar flaw: the record contains no indication that Dr. Patterson shared the reports with non-Caucasian employees. (Pl.'s Opp. 27.)

Next, Fisher insinuates that by using District 144's maintenance crew rather than a third party to test for mold at Markham, Defendants exhibited anti-Caucasian bias. (*See* Pl.'s Opp. 25 (noting that Defendants conducted the test "internally").) Fisher ignores that District 144 conducted the first mold test at Markham to accommodate her, even though the District had never received any previous complaints about mold at the school. She provides no information concerning the racial composition of the maintenance crew, either; thus, District 144's choice to use its own maintenance crew provides no plausible basis for a conclusion that Defendants discriminated against Fisher because of her race. Fisher also contends that Defendants' offer to transfer her to Markham was "a demotion from her position of Literacy Coach," and therefore constitutes evidence of race-based discrimination. (Pl.'s Opp. 26.) Fisher's argument is flat-out

inaccurate. Dr. Patterson first offered to transfer her to Markham in July 2016, long before Defendants revoked Fisher's literacy coach position. (*See* Defs.' L.R. 56.1 Stat. ¶ 26.) Finally, Fisher argues that she "was asked if she was going to retire and her willingness to return to work and retire was a problem for the District." (Pl.'s Opp. 27.) Defendants, Fisher contends, "found a way of getting rid of the problem by refusing" her request for mold testing. (*Id.*) This argument has nothing to do with Fisher's race. It also misrepresents the record. The deposition testimony to which Fisher is presumably referring shows that while she and Dr. Patterson were discussing her request for additional mold testing, Dr. Patterson simply asked Fisher if she planned to "resign." (Fisher Dep. 70:8-11, 71:9-10; *see* Pl.'s Opp. 27 (providing no record cite).)

To summarize, Fisher has not set forth a prima facie case of race discrimination, and no reasonable jury considering the evidence cumulatively could find that Defendants denied accommodations or took adverse employment actions against Fisher because she is Caucasian. The court therefore grants Defendants' motion for summary judgment on Fisher's claim for race discrimination under Title VII and 42 U.S.C. § 1981.

## CONCLUSION

For the foregoing reasons, the court grants Defendants' Motion for Summary Judgment [61].

ENTER:

Dated: March 16, 2020

_____
REBECCA R. PALLMEYER
United States District Judge